UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

PAUL STEVENSON,

           Plaintiff,

     v.

RAYMOND MADDEN, Warden,

           Defendant.

Case No.  20-cv-07340-VC

**ORDER DENYING PETITION FOR WRIT OF HABEAS CORPUS; DENYING CERTIFICATE OF APPEALABILITY**

Paul Stevenson, a state inmate, filed this petition for a writ of habeas corpus under 28 U.S.C. § 2254 challenging his criminal conviction.  Stevenson asserts four claims of instructional error and a claim that appellate counsel provided ineffective assistance.  For the following reasons, the petition is denied and a certificate of appealability will not issue.

## PROCEDURAL HISTORY

On February 10, 2014, the district attorney filed an amended information charging Stevenson, Aaron Stewart, Anthony Perry, and Stanley Turner[1] with the following offenses: Count 1, the murder of Shanice Keil; Count 2, the murder of Joshua Alford; Count 3, the murder of Leneasha Northington; Count 4, the attempted murder of Ryan Gibbs; Count 5, the attempted murder of Ikanesha Johnson; Count 6, the attempted murder of Erica Brown; and Count 7, the attempted murder of Anthony Ewing.  Clerk's Transcript ("CT") at 14-35.  The information alleged multiple murder special circumstances and firearm enhancements.

On April 17, 2014, a jury found Stevenson and his two co-defendants guilty of all counts and found the allegations and enhancements to be true.  7 CT 1814-15; 18 Reporter's Transcript

---

[1] Turner later entered a plea agreement and did not go to trial.

("RT") 2652-57; ECF No. 23-21 at 9-14.  On October 2, 2014, the trial court sentenced Stevenson to three terms of life without the possibility of parole for Counts 1 through 3; with a consecutive term of 75 years to life for the firearms enhancement in Counts 1 through 3.  2 CT 326-29; ECF No. 30 at 28-31.  The terms for the attempted murder counts were to be served concurrently with the sentences in Counts 1 through 3.  *Id.*

On July 16, 2015, Stevenson filed an appeal challenging four jury instructions.  On August 3, 2018, the Court of Appeal affirmed the judgment in a published decision.  *People v. Stevenson*, 25 Cal. App. 5th 974 (2018).  On September 12, 2018, Stevenson filed a petition for review in the California Supreme Court, which was granted, but action was deferred "pending consideration in related issue in *People v. Canizales*."  Exs. 10, 11.  On September 18, 2019, the California Supreme Court issued an order stating, "the petition for review, which was granted and held for *People v. Canizales*, 7 Cal. 5th 591, is hereby dismissed."  Ex. 12.

On November 19, 2020, Stevenson filed a motion to recall the remittitur in the Court of Appeal alleging a new claim that appellate counsel was ineffective for failing to brief the issue of insufficient evidence to support the jury's verdict.  Ex. 13.  On November 20, 2020, the Court of Appeal denied the motion.  Ex. 14.  On November 24, 2020, Stevenson filed a petition for review in the California Supreme Court, which was denied on February 10, 2021.  Exs. 15, 16.  On March 5, 2021, Stevenson filed his amended federal petition alleging the four jury instruction claims and the ineffective assistance of appellate counsel claim.

## BACKGROUND

The California Court of Appeal summarized the evidence presented at trial as follows:

> On October 1, 2011, Erica Brown, Shanice Keil, Laneasha Northington, Ikaneasha Johnson, Joshua Alford, Anthony Ewing, and Ryan Gibbs attended a party in San Leandro.  Alford was a member of the F.E. ("Fuck Everybody") group, which was described by witnesses as a "social group" of individuals who make raps on YouTube.
>
> Defendants also attended the party with a group of their friends. . .
>
> When the party ended around midnight, the seven victims got into a Ford Explorer and prepared to leave the parking lot.  As they

tried to back out of their parking spot, a white sedan pulled behind the Explorer and blocked its path. Within a minute, multiple gunshots were fired into the car.

Brown testified that gunshots were coming from the front and the back of the car, sounding "like they were coming from around the whole car." She heard "different sounds coming from two different directions" and the sounds of glass breaking and metal hitting metal. The gunfire lasted for about a minute.

Six of the seven victims were shot during the attack. Keil, Northington and Alford died as a result of their injuries. Police investigators located 10 bullet holes in the exterior of the Explorer. Both of the driver's side windows and the rear passenger side window were shattered.

Brown and a second witness identified Stevenson as one of the shooters. . . .

After the shooting, defendants regrouped at a friend's house. At that time, all three defendants made statements acknowledging their participation in the shooting. . . .

. . . Stanley Turner . . . testified to the source of the animosity between Alford and defendants. According to Turner, an incident occurred at a prior party in San Francisco when Stevenson bumped into an F.E. member or an F.E. member bumped into Stevenson. The dispute escalated with members of both groups pulling out their guns. Alford was with the F.E. group that night. No shots were fired and there were no more confrontations between defendants and the F.E. members after that evening, "[b]ut every time we seen them, [there] was animosity. It wasn't pleasant."

*Stevenson*, 25 Cal. App. 5th at 979-80.

## STANDARD OF REVIEW

A federal court may entertain a habeas petition from a state prisoner "only on the ground that he is in custody in violation of the Constitution or laws or treaties of the United States." 28 U.S.C. § 2254(a). Under the Antiterrorism and Effective Death Penalty Act, ("AEDPA"), a district court may not grant habeas relief unless the state court's adjudication of the claim: "(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d); *Williams v. Taylor*, 529 U.S. 362, 412 (2000). This is a highly deferential standard for evaluating state court rulings:

"As a condition for obtaining habeas corpus from a federal court, a state prisoner must show that the state court's ruling on the claim being presented in federal court was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement." *Harrington v. Richter*, 562 U.S. 86, 103 (2011).

When there is no reasoned opinion from the highest state court to consider the petitioner's claims, the court looks to the last reasoned opinion of the highest court to analyze whether the state judgment was erroneous under the standard of § 2254(d*). Ylst v. Nunnemaker*, 501 U.S. 797, 801-06 (1991). In this case, the California Court of Appeal is the highest court to issue a reasoned decision on Stevenson's jury instruction claims.

## DISCUSSION

### I.  Jury Instruction Claims

#### A. Federal Authority

A challenge to a jury instruction solely as an error under state law does not state a claim cognizable in federal habeas corpus proceedings. *Estelle v. McGuire*, 502 U.S. 62, 71-72 (1991). To obtain federal collateral relief for errors in the jury charge, a petitioner must show that the instruction by itself so infected the entire trial that the resulting conviction violates due process, keeping in mind that the category of errors that violate fundamental fairness is narrowly drawn. *Id.* at 72-73; *Cupp v. Naughten*, 414 U.S. 141, 147 (1973). The instruction must be considered in the context of the instructions as a whole and the trial record. *Estelle*, 502 U.S. at 72. Where the issue is the failure to give an instruction, the burden on the claimant is heavier because an omitted or incomplete instruction is less likely to be prejudicial than an instruction that misstates the law. *Henderson v. Kibbe*, 431 U.S. 145, 155 (1977).

Where a state court holds the jury instructions correctly pronounce state law, "it is not the province of a federal habeas court to reexamine state-court determinations on state-law questions." *Waddington v. Sarausad*, 555 U.S. 179, 191 n.5 (2009) (citing *Estelle*, 502 U.S. at 67–68). An interpretation of state law by a state appellate court on direct appeal binds a federal habeas court. *Bradshaw v. Richey*, 546 U.S. 74, 76 (2005) (per curiam).

### B. Claims

#### 1. Natural and Probable Consequences Instruction

Stevenson argues that the jury instruction as an aider and abettor under the natural and probable consequences theory allowed the jury to find him guilty of first degree murder without finding he acted with the required willfulness and deliberation necessary for first degree murder. ECF No. 1 at 8, 55-67.  Stevenson argues here, as he did in his direct appeal that, under *People v. Chiu*, 59 Cal. 4th 155, 158-59 (2014), an aider and abettor can only be liable for second-degree murder under the natural and probable consequences theory because first degree murder "requires more than a showing of intent to kill: the killer must act deliberately, carefully weighing the considerations for and against a choice to kill before he or she completes the acts that caused the death."  ECF No. 21 at 32 (citing *Chiu*, 59 Cal. 4th at 166).

The trial court instructed on three theories of murder as to the murder counts:  direct liability; direct aiding and abetting of murder; and murder based on the natural and probable consequences of conspiracy to murder Alford or the natural and probable consequences of aiding and abetting the murder of Alford.

The trial court gave the following instruction on direct liability for murder, CALCRIM No. 520:

> To prove that the defendant is guilty of this crime, the People must prove that: [¶] 1. The defendant committed an act that caused the death of another person; [¶] AND [¶] 2. When the defendant acted, he had a state of mind called malice aforethought. [¶] There are two kinds of malice aforethought, express malice and implied malice.  Proof of either is sufficient to establish the state of mind required for murder. [¶] [The] defendant acted with express malice if he unlawfully intended to kill. [¶] [The] defendant acted with implied malice if: [¶] 1. He intentionally committed an act; [¶] 2. The natural and probable consequences of the act were dangerous to human life; [¶] 3. At the time he acted, he knew his act was dangerous to human life; [¶] AND [¶] 4. He deliberately acted with conscious disregard for human life. [¶] . . . [¶] An act causes death if the death is the direct, natural, and probable consequence of the act and the death would not have happened without the act.  A natural and probable consequence is one that a reasonable person would know is likely to happen if nothing unusual intervenes.  In deciding whether a consequence is natural and probable, consider all of the circumstances established by the evidence. [¶] If you decide that the defendant committed murder, it is murder of the

> second degree, unless the People have proved beyond a reasonable
> doubt that it is murder of the first degree as defined in CALCRIM
> No. 521.

17 RT 2627; 1 CT 262-63.

The trial court gave the following instruction on aiding and abetting liability, CALCRIM

No. 401:

> a defendant is guilty of murder based on aiding and abetting if "1.
> The perpetrator committed the crime; [¶] 2. The defendant knew
> that the perpetrator intended to commit the crime; [¶] 3. Before or
> during the commission of the crime, the defendant intended to aid
> and abet the perpetrator in committing the crime; [¶] AND [¶] 4.
> The defendant's words or conduct did in fact aid and abet the
> perpetrator's commission of the crime.

17 RT 2621; 1 CT 254.

The trial court gave the jury CALCRIM No. 402, the natural and probable consequences

of aiding and abetting the murder of Alford,  as follows:

> The defendants are charged in count 2 with the murder of Joshua
> Alford and in counts 1 and 3, respectively, with the murders of
> Shanice Kiel and Laneasha Northington . . . . [¶] You must first
> decide whether the defendant is guilty of the murder of Joshua
> Alford.  If you find the defendant is guilty of this crime, you must
> then decide whether he is guilty of the crimes charged in counts 1
> [and] 3 . . . . [¶] Under certain circumstances, a person who is
> guilty of one crime may also be guilty of other crimes that were
> committed at the same time. [¶] To prove that the defendant is
> guilty of the murders charged in counts 1 and 3 . . . , the People
> must prove that: [¶] 1. The defendant is guilty of the murder of
> Joshua Alford as charged in count 2; [¶] 2. During the commission
> of the murder of Joshua Alford a coparticipant in that murder
> committed the crime of murder as charged in counts 1 and 3 . . .;
> [¶] AND [¶] 3. Under all of the circumstances, a reasonable person
> in the defendant's position would have known that the commission
> of the murders of Shanice Kiel and Laneasha Northington . . . were
> a natural and probable consequence of the commission of the
> murder of Joshua Alford.

17 RT 2622-23; 1 CT 255.

The trial court instructed on first degree murder under CALCRIM No. 521, as follows:

> A defendant is guilty of first degree murder if the People have
> proved that he acted willfully, deliberately, and with
> premeditation.  A defendant acted willfully if he intended to kill.
> A defendant acted deliberately if he carefully weighed the
> considerations for and against his choice and, knowing the
> consequences, decided to kill.  A defendant acted with
> premeditation if he decided to kill before completing the acts that

caused death. [¶] . . . [¶] The People have the burden of proving beyond a reasonable doubt that the killing was first degree murder rather than a lesser crime.  If the People have not met this burden, you must find the defendant not guilty of first degree murder and the murder is second degree murder.

17 RT 2628; 1 CT 264.

The Court of Appeal reviewed the above instructions given by the trial court and held that the natural and probable consequences instruction did not improperly allow the jury to find Stevenson guilty of first degree murder.  The court acknowledged that *Chiu* held that a defendant may be found guilty of second degree murder under the natural and probable consequences theory, but may not be found guilty of first degree murder under this theory.  *Stevenson*, 25 Cal. App. 5th at 982.  This is because the mental states required for first degree murder are willfulness, premeditation and deliberation, which is uniquely subjective and personal and the instructions in *Chui* did not require an aider and abettor to have these mental states.  *Id.* However, the Court of Appeal distinguished the instructions in *Chui* from those given at Stevenson's trial.  *Id.* at 293.  In both cases the juries were given the natural and probable consequences instruction, which allows the jury to find the defendant guilty of murder, but does not discuss the degree of that murder.  *Id.*  In *Chui* the first degree murder instruction allowed the jury to find the defendant guilty if the jury found the perpetrator of the crime acted willfully, deliberately and with premeditation.  *Id.*  This allowed the jury to find a defendant guilty of first degree murder based on the perpetrator's premeditation and deliberation.  *Id.*  At Stevenson's trial, the first degree murder instruction was changed to read, "A defendant is guilty of first degree murder if the People have proved that *he* acted willfully, deliberately and with premeditation."  *Id.* (emphasis added).  This change corrected the error discussed in *Chui*, because under the instructions given in Stevenson's trial, a defendant could only be found guilty of first degree murder if he had the required state of mind.  *Id.* at 984.

Under Supreme Court authority, this court must defer to the California Court of Appeal's determination that the instructions were correct under state law.  *See Waddington*, 555 U.S. at 191 n.5 (where state court holds jury instructions correctly pronounce state law, a federal habeas

court has no authority to question that ruling); *Bradshaw*, 546 U.S. at 76 (interpretation of state law by a state appellate court on direct appeal binds federal habeas court). The claim is denied on this ground.

Stevenson argues the Court of Appeal's denial of his claim is unreasonable because, "in order to not misapply the natural and probable consequences instruction, the jury was required to cross-reference the clearly erroneous CALCRIM 402 instruction with a single line from CALCRIM 521. This puts an unreasonable burden on the jury to cross-reference instructions in order properly to apply the law." ECF No. 21 at 32-33 (Am Pet.).

To find Stevenson guilty of first degree murder under the natural and probable consequences theory, the jury was only required to cross-reference CALCRIM 521, the instruction on first degree murder, with the natural and probable consequences instruction. CALCRIM 521 clearly laid out all of the elements of first degree murder. In addition, the instruction told the jury, "The People have the burden of proving beyond a reasonable doubt that the killing was first degree murder rather than a lesser crime. If the People have not met this burden, you must find the defendant not guilty of first degree murder and the murder is second degree murder." 1 CT 264.

This argument is not persuasive because a jury is presumed to follow its instructions, *see Richardson v. Marsh*, 481 U.S. 200, 211, (1987).

Stevenson also argues that further development in the law, Senate Bill 1437, shows that the Court of Appeal's decision was unreasonable. Senate Bill 1437 amended Penal Code section 188, effective January 1, 2019, and provided that, to be convicted of murder, a person must act with malice aforethought, which "shall not be imputed to a person solely on his or her participation in a crime." *People v. Gentile*, 10 Cal. 5th 830, 838-39 (2020). Appellate court decisions addressing the effect of Senate Bill 1437 have held it eliminates natural and probable consequences liability for murder regardless of degree. *Id.* at 847-48.

Stevenson is correct that the current law in California would not allow him to be found guilty of murder under the natural and probable consequences theory. However, Senate Bill

1437 became effective on January 1, 2019 and Stevenson's trial took place in 2014. At Stevenson's trial, the court correctly instructed the jury on the law in effect at that time. Likewise, the Court of Appeal's denial of this claim in August 2018 was based on the law in effect at that time. Therefore, although the law has changed, it does not change the fact that, at the time the Court of Appeal issued its decision, its ruling was objectively reasonable.

### 2. Omission of Lesser Included Offense Instruction

Stevenson argues his constitutional rights were violated because the trial court denied his request to instruct the jury with the crimes of assault with a firearm or conspiracy to commit assault with a firearm, which are lesser included offenses to the murder and attempted murder charges.

In denying this claim, the Court of Appeal first held that the crimes of assault with a firearm or conspiracy to commit assault with a firearm are not lesser included offenses to murder or attempted murder. *Stevenson*, 25 Cal. App. 5th at 984-85. The court then concluded, even if these crimes were lesser included offenses, the trial court had no duty to instruct on them because no substantial evidence supported such instructions. *Id.* at 985; *see also People v. Avila*, 46 Cal. 4th 680, 705 (2009) ("even on request, the court has no duty to instruct on any lesser offense unless there is substantial evidence to support such instruction").

Under federal law, the failure of a state trial court to instruct on lesser-included offenses in a non-capital case does not present a federal constitutional claim. *Solis v. Garcia*, 219 F.3d 922, 929 (9th Cir. 2000); *see also Keeble v. United States*, 412 U.S. 205, 213 (1973) ("we have never explicitly held that the Due Process Clause of the Fifth Amendment guarantees the right of a defendant to have the jury instructed on a lesser offense"). However, "the defendant's right to adequate jury instructions on his or her theory of the case might, in some cases, constitute an exception to the general rule." *Solis*, 219 F.3d at 929. But there must be substantial evidence to warrant the instruction on the lesser included offense. *Id.* at 929-30.

This claim is denied for several reasons. First, the Court of Appeal's holding that the assault crimes are not lesser included offenses of the murder and attempted murder charges is

binding on this Court.  *See Bradshaw*, 546 U.S. at 76.  Second, no Supreme Court authority establishes a defendant's constitutional right to have a jury instructed on lesser included offenses. Therefore, the Court of Appeal's denial of this claim could not be contrary to or an unreasonable application of Supreme Court authority.

Finally, even under *Solis*, this claim fails because the evidence did not support the crimes of assault or conspiracy to assault with a firearm.  As the Court of Appeal noted, there was undisputed evidence "that the shooters ambushed and intentionally fired their guns into the car. That act at a minimum established implied malice sufficient to establish the commission of murder." *Stevenson*, 25 Cal. App. 5th at 985.  Stevenson argues the evidence also supported an inference of assault with a firearm because two witnesses only testified they felt "something" was going to happen and no witness testified that a murder was going to be committed.  ECF No. 21 at 36-37.  However, Stevenson's argument overlooks the evidence that the defendants ambushed and intentionally fired their guns from all directions into a parked car that held many passengers.  There could be no inference of assault from these actions.

For all these reasons, this claim is denied.

### 3. "Kill Zone" Instruction

Stevenson argues the jury instruction on the kill zone theory of attempted murder was unconstitutionally vague and ambiguous and, thus, allowed the jury to convict him of attempted murder of the passengers in the Ford Explorer without finding he intended to kill them.

The jury was instructed on the kill zone theory, given as part of the attempted murder instruction, as follows:

> The defendants are charged in counts 4, 5, 6 and 7 with attempted murder. [¶] To prove that the defendant is guilty of attempted murder, the People must prove that: [¶] 1. The defendant took at least one direct but ineffective step toward killing another person; [¶] AND [¶] 2. The defendant intended to kill a person. . . . [¶]
>
> A person may intend to kill a specific victim or victims and at the same time intend to kill everyone in a particular zone of harm or 'kill zone.'  In order to convict the defendant of the attempted murder of Ryan Gibbs, Ikaneasha Johnson, Erica Brown or Anthony Ewing, the People must prove that a defendant not only

> intended to kill Joshua Alford but also either intended to kill Ryan Gibbs, Ikaneasha Johnson, Erica Brown or Anthony Ewing, or intended to kill everyone within the kill zone.  If you have a reasonable doubt whether the defendant intended to kill Ryan Gibbs, Ikaneasha Johnson, Erica Brown or Anthony Ewing or intended to kill Joshua Alford by killing everyone in the kill zone, then you must find the defendant not guilty of the attempted murder of Ryan Gibbs, Ikaneasha Johnson, Erica Brown or Anthony Ewing.

1 CT 265-66.

The Court of Appeal held this claim was forfeited on appeal because counsel for the three co-defendants agreed to the instruction and failed to request a clarifying instruction.   On the merits, the Court of Appeal denied the claim, finding there was no reasonable likelihood the jury would have misinterpreted the instruction.  *Id.* at 987.

In reviewing an ambiguous instruction, the defendant must show both ambiguity and a "reasonable likelihood" that the jury applied the instruction in a way that violates the Constitution, such as relieving the state of its burden of proving every element beyond a reasonable doubt.  *Waddington v. Sarausad*, 555 U.S. 179, 190-191 (2009).

Even if this claim is not defaulted, it fails on its merits.  The kill zone instruction stated that, to find Stevenson guilty of attempted murder, the jury had to find that he not only intended to kill Alford, but that he intended to kill another passenger in the vehicle with Alford, or everyone in the vehicle.  As the Court of Appeal explained, "a concurrent intent to kill nontargeted victims may be inferred when the defendant uses lethal force calculated to kill everyone within an area around the intended target as a means of ensuring the target's death. Firing multiple shots directly at a small group at close range will give rise to a reasonable inference that the shooter intended to kill all in the group."  *Stevenson*, 25 Cal. App. 5th at 986. Not only is this instruction unambiguous, there is also no reasonable likelihood the jury misapplied it.

Stevenson relies on *People v. Canizales*, 7 Cal. 5th 591 (2019), issued after the Court of Appeal issued its opinion.  Although the *Canizales* opinion cautioned against using the kill zone theory of attempted murder, it's description of evidence that would warrant the kill zone

instruction is similar to the evidence in this case.  The Court approved the kill zone instruction in cases where: (1) the defendants opened fired while in close proximity to the area surrounding their intended target; (2) the defendant approached the driver's side of a vehicle and started shooting into the vehicle and kept shooting as the car started to drive away; and (3) the defendant stood 21 feet away and fired 10 gunshots at four people in close proximity to one another, hitting three of them.  *Id.* at 611.  In Stevenson's case, the evidence that Stevenson and his co-defendants approached the parked Explorer and fired many times from different directions into the vehicle, killing three of the passengers and wounding three, is sufficient to warrant the kill zone instruction of attempted murder.  Furthermore, that the California Supreme Court deferred ruling on Stevenson's petition for review until it issued its opinion in *Canizales* and that after it issued *Canizales* it dismissed Stevenson's petition, shows that the Court likely viewed Stevenson's case as warranting the kill zone instruction.

### 4. Motive Instruction

The motive instruction informed the jury that whether Stevenson had a motive to commit the crime may tend to prove his guilt.  Stevenson argues that because the prosecutor's case was largely based on circumstantial evidence and because the only factor tying him to the shooting was his anger against Alford, the jury should have been instructed that motive had to be proved beyond a reasonable doubt.  Otherwise, Stevenson argues, the jury would have misinterpreted the motive instruction to improperly reduce the prosecution's burden of proof.

The Court of Appeal held that, because motive is not an element of the crime, the prosecutor was not required to prove motive beyond a reasonable doubt.  *Stevenson*, Cal. App. 5th at 987-88.

The jury was given the following instruction on motive:

> The People are not required to prove that the defendant had a motive to commit any of the crimes charged.  In reaching your verdict you may, however, consider whether the defendant had a motive.  Having a motive may be a factor tending to show the defendant is guilty.  Not having a motive may be a factor tending to show the defendant is not guilty.

1 CT 251.

The jury was also given the following instruction on circumstantial evidence:

> Before you may rely on circumstantial evidence to conclude that a fact necessary to find the defendant guilty has been proved, you must be convinced that the People have proved each fact essential to that conclusion beyond a reasonable doubt. . . .

1 CT 230.

Other instructions informed the jury that the defendant is presumed innocent and that the prosecution has the burden to prove every element of the crimes charged beyond a reasonable doubt. Given these instructions, there is not a reasonable likelihood that the jury misapplied the motive instruction in a way that reduced the prosecutor's burden of proof. And, as discussed in the next section, Stevenson's main premise for this claim, that no evidence other than motive tied him to the shootings, is incorrect.

Therefore, the Court of Appeal's denial of this claim was not objectively unreasonable.

## II. Ineffective Assistance of Appellate Counsel

### A. Standard of Review

Stevenson argues appellate counsel rendered ineffective assistance because he failed to raise on appeal the claim that the evidence was insufficient to prove Stevenson was involved in the shooting. Because the state courts declined to rule on this claim, this court must review the record de novo. *See Cone v. Bell*, 556 U.S. 449, 472 (2009) (where state courts fail to reach merits of a claim, federal habeas review not subject to the deferential standard that applies under AEDPA); *Lewis v. Mayle*, 391 F.3d 989, 996 (9th Cir. 2004) (when state court explicitly declines to decide an issue, as opposed to simply not mentioning it, review is de novo).

### B. Legal Standard

#### 1. Ineffective Assistance of Appellate Counsel

The Due Process Clause of the Fourteenth Amendment guarantees a criminal defendant the effective assistance of counsel on his first appeal as of right. *Evitts v. Lucey*, 469 U.S. 387, 391-405 (1985). Claims of ineffective assistance of appellate counsel are reviewed according to

the standard set out in *Strickland v. Washington*, 466 U.S. 668 (1984).  *Smith v. Robbins*, 528

U.S. 259, 285 (2000).  First, the petitioner must show that counsel's performance was objectively

unreasonable, which in the appellate context requires the petitioner to demonstrate that counsel

acted unreasonably in failing to discover and brief a merit-worthy issue.  *Id.*  Second, the

petitioner must show prejudice, which in this context means that the petitioner must demonstrate

a reasonable probability that, but for appellate counsel's failure to raise the issue, the petitioner

would have prevailed in his appeal.  *Id.* at 285-86.

Appellate counsel does not have a constitutional duty to raise every nonfrivolous issue

requested by defendant.  *Jones v. Barnes*, 463 U.S. 745, 751-54 (1983); *Gerlaugh v. Stewart*, 129

F.3d 1027, 1045 (9th Cir. 1997).  The weeding out of weaker issues is widely recognized as one

of the hallmarks of effective appellate advocacy.  *Miller v. Keeney*, 882 F.2d 1428, 1434 (9th

Cir. 1989).  Appellate counsel therefore will frequently remain above an objective standard of

competence and have caused his client no prejudice for the same reason: because he declined to

raise a weak issue.  *Id.*  If ineffective assistance of appellate counsel is found, in the absence of

any trial errors, the appropriate relief is a new appeal.  *Id.*

### 2. Insufficient Evidence

The Due Process Clause "protects the accused against conviction except upon proof

beyond a reasonable doubt of every fact necessary to constitute the crime with which he is

charged."  *In re Winship*, 397 U.S. 358, 364 (1970).  A state prisoner who alleges that the

evidence in support of his state conviction cannot be fairly characterized as sufficient to have led

a rational trier of fact to find guilt beyond a reasonable doubt therefore states a constitutional

claim.  *Jackson v. Virginia*, 443 U.S. 307, 321 (1979).  However, *Jackson* claims face a high bar

in federal habeas proceedings.  *Coleman v. Johnson*, 566 U.S. 650, 651 (2012) (per curiam).  The

federal habeas court "determines only whether, 'after viewing the evidence in the light most

favorable to the prosecution, *any* rational trier of fact could have found the essential elements of

the crime beyond a reasonable doubt.'"  *Jackson*, 443 U.S. at 319 (emphasis in original).  Only if

no rational trier of fact could have found proof of guilt beyond a reasonable doubt, has there been

a due process violation.  *Id.* at 324.  If confronted by a record that supports conflicting inferences, a federal habeas court "must presume—even if it does not affirmatively appear in the record—that the trier of fact resolved any such conflicts in favor of the prosecution, and must defer to that resolution."  *Id.* at 326.  Under *Jackson*'s standard of review, a jury's credibility determinations are entitled to near-total deference.  *Bruce v. Terhune*, 376 F.3d 950, 957 (9th Cir. 2004).

Under California law, the standard for a claim of insufficient evidence on appeal is similar to the federal habeas standard.  The appellate court must "review the entire record, and drawing all reasonable inferences in favor of [the judgment], . . . determine whether a rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *People v. Hughes*, 27 Cal. 4th 287, 370 (2002).  "If the circumstances reasonably justify the jury's findings as to each element of the offense, the judgment may not be overturned when the circumstances might also reasonably support a contrary finding."  *People v. Lewis*, 25 Cal. 4th 610, 643–644 (2001).

**C. Analysis**

Briefly, the evidence established that, after a "tattoo" party, a Ford Explorer with seven passengers was attempting to leave its parking space when it was surrounded by several people who fired guns directly into the car, killing three passengers and wounding three.  During closing arguments, counsel for each of the three co-defendant argued that the evidence showed the shooters were the other two defendants, but not his client.  ECF No. 23-19 at 91 through ECF No. 23-20 at 100.

As Stevenson suggests, the prosecutor's case was largely based on motive and identification.  The prosecutor also relied on evidence that Stevenson admitted to his friends that he shot his gun into the Explorer and that, after the shooting, Stevenson attempted to alter his appearance by cutting off his dreadlocks.

### 1. Motive

#### a. Evidence

Stanley Turner, who was friends with the defendants and who was present at the tattoo party, testified to the following:  Some time before the tattoo party, an altercation took place in a San Francisco nightclub between Stevenson and Josh Alford.  6 RT 1174.  Several people at the nightclub were members of the F.E. group and Alford was with them.  7 RT 1184.  The incident at the nightclub started when Stevenson bumped into Alford or Alford bumped into Stevenson.  7 RT 1185.  Some words were exchanged and one of the F.E. members had a gun.  *Id.*  Stevenson, who was angry, came over to his group of friends and told them what happened.  7 RT 1185-86. Turner and a friend named Dev Leverett went out to their car to get guns.  7 RT 1187.  When they returned, their entire group, led by Stevenson, walked over to the F.E. members to ask them what was going on.  *Id.*  Turner and Leverett pulled out their guns.  7 RT at 1189.  The individuals with the guns were talked down.  7 RT 1190.  After that, whenever Stevenson and his group saw people from F.E., "there was animosity, it wasn't pleasant."  *Id.*

 At the tattoo party, Anthony Allen, a member of Stevenson's group, came over to tell the group he saw Josh, the person from F.E that "they got into it with."  7 RT  1213.  They all started talking about it.  *Id.*  Stevenson said he didn't like any of them.  7 RT 1214.  He was angry.  *Id.* Stevenson said, "'Fuck 'em.'"  He  "didn't like none of 'em."  7 RT 1216.

#### b. Analysis

The undisputed evidence is that, at the San Francisco nightclub, Stevenson and Alford bumped into each other, which led to such a heated altercation between Stevenson's group and Alford's group that guns were drawn.  There was continued animosity between Stevenson's group and Alford's group.  The evidence also showed that, at the tattoo party, when Stevenson saw Alford, his anger was reignited.

Viewing this evidence in the light most favorable to the prosecution, a reasonable jury could have found it provided a motive for Stevenson to kill Alford.  As discussed previously, because motive is not an element of the crime, the jury did not need to find it beyond a

reasonable doubt.

### 2. Identification

#### a. Testimony of Matthew Hudson

Matthew Hudson testified to the following:  He drove to the tattoo party with friends.  11 RT 1717.  During the party, Hudson went outside where he saw Stevenson and asked him for a cigarette.  *Id.*  After the party, Hudson got back into his friend's car to leave; he was seated behind the driver.  11 RT 1720.  The driver pulled out of the parking lot and then stopped so he could speak to a friend.  11 RT 1721.  They were parked for about a minute or two when Hudson heard shots fired.  11 RT 1722.  When Hudson first heard the shots, he ducked down, but when the shots continued to be fired, he looked out of the window to see where they were coming from.  11 RT 1723.  Hudson saw someone shooting at the front driver's side window of a Ford Explorer.  *Id.*  Although he could only see the back of the person, he could see the person had on a hoodie and dreadlocks.  *Id.*  He could clearly see the person was holding a gun, pointing it straight in front of him and shooting into the car.  11 RT 1723-24.  The shooting lasted for about 20 seconds.  11 RT 1724.  Prior to the tattoo party, Hudson had seen Stevenson at two other parties, but did not know him personally.  11 RT 1727.

After the shooting, Hudson was interviewed at the police station.  11 RT 1729.  Hudson told the investigator that he had seen Stevenson at other parties and he noticed him when he first walked inside the tattoo party because, "You can tell someone's figure, like their silhouette. . ." 11 RT 1756.  Hudson described the shooter he saw as a light-skinned black male with dreads and gold teeth and who was wearing a Hollister hoodie.  11 RT 1729-30.  The next day, the police asked Hudson to describe the shooter to the sketch artist and he gave them a description of Stevenson's features.  11 RT 1730, 1777.  Hudson identified Stevenson in a photo lineup.  11 RT 1732.

On cross-examination, Hudson testified that he could not see the face of the shooter because the shooter's back was turned toward him.  11 RT 1763.  Hudson answered, "yes," to the question, "Because you recognized Mr. Stevenson from previous events, when you were

asked to describe what he looked like, you gave the sketch artist some description of his features. Correct?" 11 RT 1777.  On re-direct, Hudson testified that he saw the shooter walking up to the Explorer, shooting as he was walking.  11 RT 1784-85.

### b. Analysis

Stevenson argues Hudson's identification was insufficient because Hudson could only see the back of the shooter from his position and, thus, he could not have described Stevenson's facial features.  However, although Hudson testified he could not see the shooter's face, he testified that he recognized Stevenson at the tattoo party because he had seen him at other parties and he could recognize Stevenson from his silhouette or figure.  He testified that when he looked toward the sound of the shots, he saw the shooter walking up to the car.  Viewing the evidence in the light most favorable to the prosecution, a reasonable jury could have found that Hudson identified Stevenson from his silhouette or his figure and the way he walked.

Stevenson argues Hudson was an unreliable witness because of the inconsistency between his testimony that he saw one shooter and his statement to the police that he saw two: one on the driver's side of the Explorer and one on the passenger's side.  11 RT 1766-67, 1788. Although Hudson told the police there were two shooters, he clarified that he surmised there were two shooters from the sounds of the shots fired.   11 RT 1770.  He also testified that he may have seen a shadow of a person on the passenger side of the car.  11 RT 1789.  It was up to the jury to decide if this inconsistency affected Hudson's credibility.

Stevenson also argues Hudson was unreliable because he was in shock at the time of the shooting and remained in a state of shock for three years since the shooting.  11 RT 1770. Although Hudson testified that he was in shock, he reiterated that he was truthfully testifying to what he saw at the shooting.  It was up to the jury to decide from Hudson's demeanor whether the shock affected his testimony.

Viewing Hudson's testimony in the light most favorable to the prosecution, any reasonable juror could have found beyond a reasonable doubt that Hudson recognized Stevenson from the way he walked, from his figure and from his silhouette and that his one inconsistency

and shock from the shooting did not affect his identification.

### c. Testimony of Erica Brown

Erica Brown was one of the victims who survived the shooting.  She testified to the following:  She went to the tattoo party with some friends in a Ford Explorer.  4 RT 739.  When the party ended, they went back to the Explorer to leave.  4 RT 746-47.  Brown was sitting in the front passenger seat.  4 RT 747.  Her friend, Shanice, was driving.  *Id.*  One of her friends knew Josh Alford and offered to give him a ride home.  4 RT 747-48.  Alford sat in the back.  *Id.*  When everyone was in the car, Shanice tried to leave, but a white car that was parked directly behind the Explorer blocked them from exiting.  4 RT 749.  Then, a male with dreads and wearing a hoodie approached the driver's side of the car.  4 RT 750.  Brown was talking to Shanice at this time, so she was facing the driver's side of the car and was looking toward the man at the driver's side window.  4 RT 796.  Brown didn't see the gun in the man's hand, but she saw something shiny and heard the boom.  4 RT 751.  She saw fire coming out of the gun.  *Id.*  Immediately after the person started shooting, Brown ducked under the dashboard.  *Id.*  Brown only saw this one shooter, but she heard shots coming from different directions, so she thought there could be more than one shooter.  4 RT 752.  Besides the shooter's dreads, she saw the shooter's eyes, nose and partial lip.  4 RT 794.  After the shooting, she called the police.  4 RT 753.  While she was talking to the police, she noticed she had been shot.  4 RT 754.  She was taken to the hospital where she stayed for two and a half weeks.  *Id.*  The police interviewed her the day after the shooting.  4 RT 755.  About 23 days after the shooting, Brown picked Stevenson's picture out of a photo line-up.  4 RT 755-56.  When Brown saw Stevenson's photo in the line-up, her body reacted physically, she started sweating and had an eerie feeling, a bad feeling.  4 RT 818.  She had never seen Stevenson before.  4 RT 756.

On cross-examination, Brown admitted that at the preliminary hearing she had testified that she could not see the shooter's face and she told the detective who interviewed her at the hospital that she did not see the shooter's hair.  4 RT 796, 799.  However, she reiterated that she saw the person's eyes, nose and part of his lip.  4 RT 796.  And though she admitted that she

only saw the shooter for a second or two before she ducked, her memory of the events was "clear enough."  4 RT 801.

### d. Analysis

Stevenson argues Brown's identification was insufficient to prove he was one of the shooters because she ducked down immediately after the shooter started shooting, so she did not get a good look at the shooter and admitted she only saw a portion of the shooter's face.

Although Brown ducked down, she did so after the shooting started.  4 RT 751.  Brown, who was sitting in the front passenger seat, was looking at Shanice, the driver, when the shooter approached the driver's side of the car, so Brown could see the shooter.  4 RT 750-51.  She saw a person with a hoodie and dreads before she ducked down.  *Id.*  Although she said she could not see his entire face, she repeatedly testified she saw his eyes, his nose and part of his lips and his hair.  Twenty-three days after the shooting, when Brown was shown a series of photographs, she immediately identified Stevenson's photograph as the shooter. getting an eerie feeling in her body when she saw his photo, "the same feeling she got when she saw the person outside the car before the shooting."  *Id.*  4 RT 756.

Viewing Brown's testimony in the light most favorable to the prosecution, any reasonable juror could have found beyond a reasonable doubt that she saw enough of Stevenson's face to identify him.  Furthermore, a reasonable jury could have found that the identifications of Hudson and Brown corroborated each other, adding further weight to each identification.

### 3. Other Inculpatory Evidence

#### a. Evidence

Turner testified that after the party all his friends went to Kwas' house to discuss the shooting and Stevenson said he shot his gun.  7 RT 1230, 1238.  Turner's testimony was corroborated by Anthony Allen, Stevenson's good friend.  9 RT 1561, 1563.

Allen was in the parking lot when the shooting occurred.  He testified to the following: After the shooting, he had three interviews with the police.  In the first two interviews, he tried to

help his friend Stevenson and told the police that Stevenson was in his friend Dusty's car when the shooting occurred.  9 RT 1448, 1456.  In the third interview, Allen admitted he didn't know where Stevenson was after the party was over.  9 RT 1458.  Allen saw that Stevenson had a gun at the party, a .22.  9 RT 1458-59.  After the shooting, at Kwas' house, Stevenson said, "Oh, yeah, I had to empty my clip and da-da-da-da-da-da-da."  9 RT 1462.  After Stevenson found out that three innocent girls were killed, the look on his face changed, like he was hurt.  9 RT 1463.  Later, Stevenson told Allen he didn't do it.  *Id.*  At the end of direct examination, Allen stated, "I feel that Paul didn't shoot."  9 RT 1468.  When the prosecutor asked, "But that's not what he told you?" Allen answered, "Right.  So I don't really know.  You can't really ask me."  *Id.*

On cross-examination by Stevenson's attorney, Allen testified that he saw Perry and Stewart go up to the Ford Explorer and shoot into it, but he did not see Stevenson shoot into the Explorer because he was in Dusty's car.  9 RT 1498, 1521-2.  When asked if he believed Stevenson when Stevenson told him he "emptied his clip," Allen testified, "I didn't believe Paul," but added "I couldn't tell you.  Only him and God knows if he was a shooter.  I don't know.  I can't tell you if he was a shooter."  9 RT 1539.  Later, Allen testified that he didn't know if Stevenson actually got into Dusty's car.  9 RT 1544.  The day after the shooting, Stevenson cut off his dreadlocks.  10 RT 1618.

### b. Analysis

Stevenson argues that his statement that he discharged a firearm should be discounted as mere puffery, said to gain the admiration of his friends.  He argues this is true because later he told his friend Allen that he did not shoot.

Viewing both statements in the light most favorable to the prosecution, together with the evidence that Stevenson looked hurt when he found out that "innocent girls" were killed,  a reasonable jury could have found the first statement was an admission of guilt corroborated by his apparent dismay that other people were killed in addition to Alford, the intended target.

Stevenson argues that Allen's identification of Perry and Stewart as the shooters and his testimony that Stevenson was in Dusty's car during the shooting refutes the eyewitness

identifications of Stevenson as one of the shooters.  However, Allen's testimony revealed that he lied during his interviews with the police to protect Stevenson and he finally admitted he did not know where Stevenson was during the shooting.  Viewing this evidence in the light most favorable to the prosecution, a reasonable jury could find that Allen's testimony did not refute eyewitness identifications of Hudson and Brown.  Furthermore, viewing the evidence in the light most favorable to the prosecution, the jury could have reasonably found that Stevenson cut off his dreadlocks the day after the shooting as an attempt to avoid being identified as one of the shooters.

### 4. Exculpatory Evidence

Stevenson points out that no forensic evidence tied him to the shooting as follows: Investigators recovered .40 caliber shell casings from the driver's side of the Explorer, 10 RT 1648-50, and .9  caliber casings from the passenger side, 10 RT 1668.  The .40 caliber bullets appeared to have been fired from a Glock, 14 RT 2160, and Allen saw Perry in possession of a Glock, 10 RT 1622.  Allen told investigators that Stewart owned a .9mm Beretta.  11 RT 1820-21.  Although Allen saw Stevenson with a .22 caliber firearm at the tattoo party, no .22 caliber casings were found at the scene and officers did not find any gun when they searched Stevenson's home.  9 RT 1458-59.  Stevenson argues the lack of forensic evidence tying him to the shooting, the fact that Allen identified only Perry and Stewart as the shooters and the weak identifications of Hudson and Brown undercut any weight the jury might have given to his statement at Kwas' house about emptying his clip.  Am. Pet. at 39; ECF No. 21 at 48; Traverse at 8; ECF No. 31-1 at 8.

As discussed above, the identification testimony of two eyewitnesses who corroborated each other was strong evidence that Stevenson was the shooter on the driver's side of the Explorer.  Furthermore, a reasonable jury could discount Allen's testimony that Stevenson was not near the Explorer during the shooting because Allen admitted he lied to the police to protect Stevenson and, in actuality, he did not know where Stevenson was during the shooting.  The lack of evidence of a gun linking Stevenson to the shooting was the most compelling exculpatory

evidence.  However, looking at the evidence in the light most favorable to the prosecution, based on the testimony of Hudson and Brown that they saw Stevenson shoot into the driver's side of the Explorer and Stevenson's statement that he was one of the shooters, a reasonable juror could have found that he retrieved a gun before the shooting and disposed of it afterward.

### 5. Appellate Counsel

Stevenson argues that there was no tactical reason for appellate counsel not to brief the sufficiency of the evidence claim because it was obvious that there was insufficient evidence to support the jury's verdict.  Of course, appellate counsel could have briefed this issue.  However, his performance was not deficient for failing to do so.  As discussed above, Stevenson's claims that the eye-witness identifications were shaky and that Allen's testimony exonerated Stevenson are not an accurate reading of the record.  Furthermore, Stevenson's arguments fail to recognize the high bar insufficiency of evidence claims face on appeal in state court and in federal habeas proceedings.  In particular, a state appellate court must analyze a sufficiency of the evidence claim by "drawing all reasonable inferences in favor of [the judgment], . . . [and then] determine whether a rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Hughes*, 27 Cal. 4th at 370.  Stevenson ignores the fact that a state appellate court would have to draw all reasonable inferences in favor of the judgment.  Given this high bar to insufficiency of the evidence claims and the discussion above (which shows that the evidence against Stevenson was strong), appellate counsel did not act unreasonably for failing to address this issue on appeal.  For the same reason, Stevenson has not demonstrated a reasonable probability that, but for appellate counsel's failure to raise this issue, Stevenson would have prevailed on appeal.

Based on the court's de novo review of the record, this claim is denied.

### CONCLUSION

Stevenson's petition for a writ of habeas corpus is denied.  A certificate of appealability will not issue.  *See* 28 U.S.C. § 2253(c).  This is not a case in which "reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong." *Slack v.*

*McDaniel*, 529 U.S. 473, 484 (2000).  The Clerk shall enter judgment in favor of the respondent and close the file.

**IT IS SO ORDERED.**

Dated:  03/23/2022

_____

VINCE CHHABRIA
United States District Judge